**STATE of Maine**

v.

**Edward MICHAUD.**

Supreme Judicial Court of Maine.

Argued Jan. 7, 1986.

Decided Aug. 7, 1986.

in Superior Court (Kennebec County) convicting him of murder, 17–A M.R.S.A. § 201(1)(B), (1–A) (1983 & P.L.1983, ch. 450, § 2). We find no merit in any of the defendant's numerous claims of error at trial and therefore affirm his conviction.

### Facts

At trial, the parties stipulated that the defendant by firing a shotgun caused the death of nine year-old Garrett Brann in the early morning hours of December 10, 1983. The jury would have been warranted in finding the following facts. At the time of the shooting, the defendant and Diane Byford-Brown were living together in Mercer along with Byford-Brown's nine year-old daughter. They had been together for five years. However, since their relationship had been "disintegrating," they had agreed to part company after the Christmas holidays.

On December 9, 1983, their neighbor, Harriet Hunt, who lived a few hundred yards from the defendant's home, asked Byford-Brown to come to her home and babysit for the evening with two of Hunt's three children. Hunt's son, Randy, was to spend the night at Garrett Brann's home, located about a quarter of a mile away. Byford-Brown agreed, and she arrived at the Hunt home at 5:00 p.m. A few hours later, Byford-Brown drove Randy to the Brann home to drop him off for the night. While she was at the Brann residence, the defendant suddenly walked in the front door, announced he had "places to go, people to see" and then quickly left, driving off in Byford-Brown's vehicle. Eventually, because Byford-Brown no longer had the use of a vehicle, Clayton Brann drove her back to Hunt's home, where he and his son Garrett had dinner.

Sometime during the evening, the defendant called Byford-Brown at the Hunt home and informed her that he was angry and that he planned to become intoxicated and "find a new woman." At 11:00 p.m., Byford-Brown thought it was time to put the children to bed. Clayton Brann had

James Tierney, Atty. Gen., Charles K. Leadbetter (orally), Asst. Atty. Gen., Augusta, for the State.

Shiro and Shiro, Louis J. Shiro (orally), Waterville, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, GLASSMAN and SCOLNIK, JJ.

SCOLNIK, Justice.

The defendant, Edward Michaud, appeals from a judgment entered on a jury verdict

fallen asleep in front of the television set. After Randy tried unsuccessfully to awaken Clayton, Byford-Brown put the three Hunt children, her daughter, and Garrett and Randy to bed upstairs in the children's bedrooms. Sometime later Clayton woke up. Because Garrett had already gone to bed, Byford-Brown suggested that he go upstairs and lie down in the master bedroom. Clayton agreed and went upstairs. After cleaning up the house, Byford-Brown also went upstairs and fell asleep beside Brann; they both were fully clothed.

Early in the morning of December 10, 1983, the defendant left a party held in Benton in an intoxicated condition and drove home. The car that he was driving ran out of gas near his home. While he was walking home, he saw a light on outside of the Hunt home. Knowing that Byford-Brown was inside the home along with her daughter and two of Hunt's children, the defendant decided to go inside. He eventually went upstairs to the master bedroom where he found Clayton Brann and Byford-Brown lying on a bed. The defendant immediately became angry, awoke Byford-Brown and stated: "I caught you," "I got you." He left the bedroom and went down the stairs. Byford-Brown followed closely behind him. She tried to stop him, stating: "Eddie, there's five kids here, I don't want to fight." The defendant responded by hitting her over the head with a rocking chair and kicking her as she was lying on the floor.

The defendant left the house and proceeded to his own home. He called the Hunt residence twice and told Byford-Brown that "[t]here's nowhere you can hide, you are all going to die." After gathering his twelve-gauge shotgun and a .44 magnum revolver that was equipped with a scope, the defendant returned to the vicinity of the Hunt home. When Byford-Brown saw the defendant outside the house with the guns, she ran upstairs to awaken Clayton Brann. She told him that the defendant was outside with a gun and to hide the children. She ran downstairs and hid in a closet.

Clayton Brann went downstairs to put on his boots. Suddenly he heard two shotgun blasts come through the closed front door. Garrett Brann, who had been awakened by the earlier commotion, was descending the stairs at the moment the shots were fired. He was struck and killed by one of the two blasts. Clayton Brann immediately went to aid his son. He picked him up and carried him into the kitchen. While both Clayton and Byford-Brown attended to Garrett, the defendant went around to the rear of the house and fired his revolver through a kitchen window. The shot barely missed both Clayton's and Byford-Brown's heads. Byford-Brown went to the cellar and hid. The defendant yelled for Clayton to come outside. Clayton went to the front door, turned the outside light off, and ran to obtain help. As he was running, the defendant stated: "Clayton, I got my sights on you but I don't want you, I want Diane." The defendant entered the Hunt residence, locked the door, and searched unsuccessfully for Byford-Brown. While inside, he went upstairs and told the remaining children: "Kids, you might as well come out, your mother is dead." He then returned to the first floor and stated: "Diane, you might as well come out, all the kids are dead." The defendant subsequently left the residence.

At trial, the defendant testified that after seeing Byford-Brown and Clayton Brann on the bed together, both without "jeans on," he could only recall firing his shotgun at a light bulb that was shining in his face, seeing Clayton leave the house and Garrett on the couch with blood stains on his shirt. The defendant fired the shotgun from a distance of about fifty feet from the house, hitting the upper right window of the front door, about three to five inches from the floodlight that was located above the front door of the house. One witness testified that the defendant was a very good shot.

The defendant was charged, in a two count indictment, with two alternative forms of murder, a knowing killing under 17–A M.R.S.A. § 201(1)(A) (1983), and a "depraved indifference" killing under M.R. S.A. 17–A § 201(1)(B), (1–A). As to both counts, the defendant entered a plea of not guilty and not guilty by reason of insanity. On Count I, which charged the defendant with the "knowing" murder of Garrett Brann, the jury returned a verdict of guilty of manslaughter. On Count II, the "depraved indifference" charge, the jury returned a verdict of guilty of murder. The trial justice adjudicated the defendant guilty of murder as convicted on Count II.

## I. Constitutionality of the "Depraved Indifference" Murder Statute, 17–A M.R.S.A. § 201(1)(B), (1–A)

Count II of the indictment charged the defendant with "depraved indifference" killing under section 201(1)(B) and (1–A) of our Criminal Code. That section provides:

**1.** A person is guilty of murder if:

. . . .

**B.** He engages in conduct which manifests a depraved indifference to the value of human life and which in fact causes the death of another human being.

**1–A** For purposes of subsection 1, paragraph B, a person engages in conduct which manifests a depraved indifference to the value of human life when:

　**A.** Either he knows that there is a very high degree of risk that his conduct will cause death or serious bodily injury, or a reasonable and prudent person in his situation would know of that risk; and

　**B.** His conduct, when viewed in light of the totality of the circumstances, reflects such an indifference to the value of human life that it would be generally regarded by a reasonable and prudent person as depraved.

As used in paragraph B, "totality of the circumstances" means the nature and purpose of the actor's conduct, the circumstances known to the actor and the circumstances which would have been apparent to a reasonable and prudent person in the actor's situation. "Depraved" means outrageous, revolting, savage, brutal or shocking, readily demonstrating an almost total lack of concern or appreciation for the value of human life.

On appeal, the defendant contends that subsection 1–A is unconstitutional because of its "vagueness, inherent contradictions and the absence of a culpable mental state" and that his conviction deprived him of due process.

### A. Vagueness

Prior to 1983, the term "depraved indifference to the value of human life" as employed in section 201(1)(B) was nowhere defined in the Criminal Code. The consistent construction of this term in prior decisions of this court, however, has become "a part of the statute as definitely as if the Legislature itself had amended the statute to reflect expressly the judicial construction." *State v. Crocker*, 435 A.2d 58, 63 (Me.1981) (quotation and citation omitted). We said that death-producing conduct will justify a verdict of guilty of depraved indifference murder if

　a jury could find that that conduct was so heinous in the eyes of the law as to constitute murder. The accused must consciously have engaged in conduct that he should have known would create a very high degree of risk of death or serious bodily injury and it must also under the circumstances [have been] unjustifiable for him to take the risk.

*Id.* (quotations and citations omitted); *see also State v. Joy*, 452 A.2d 408, 410–11 (Me.1982); *State v. Flick*, 425 A.2d 167, 173 (Me.1981); *State v. Lagasse*, 410 A.2d 537, 540 (Me.1980); *State v. Woodbury*, 403 A.2d 1166, 1171–73 (Me.1979). Furthermore, prior to the enactment of section 201(1–A), we declared that section 201(1)(B) is not unconstitutionally vague. *See State v. Crocker*, 435 A.2d at 63–67.[1]

---

**1.** We similarly recognized that the depraved in-

difference murder statute departs "from the or-

In 1983, the Legislature enacted section 201(1–A) to define "conduct which manifests a depraved indifference to the value of human life" ostensibly as that term had been construed by this court. *See* L.D. 1360, Statement of Fact (111th Legis.1983); P.L.1983, ch. 450, § 2 (effective Sept. 23, 1983), *repealed by* P.L.1985, ch. 416 (effective September 19, 1985).[2] Similar to our previous constructions of section 201(1)(B), *see, e.g., State v. Crocker,* 435 A.2d at 67, paragraph A of section 201(1–A) focuses on the degree of risk of serious bodily injury or death that the death-producing conduct creates, while paragraph B of section 201(1–A) focuses on the degree to which the death-producing conduct, objectively viewed, demonstrates a lack of concern or appreciation for the value of human life. Although section 201(1–A) differs in some respect from our prior construction of section 201(1)(B)—most notably by the inclusion in the assessment of the degree of the risk of death or serious bodily injury of a subjective component, "he knows," as an alternative to an objective component, "a reasonable and prudent person in his situation would know"—the differences do not render section 201(1)(B), (1–A) unconstitutionally vague.

■ In *State v. Parker,* 372 A.2d 570, 573 (Me.1977), we said:

A criminal statute fails to give fair warning of its scope, in accordance with due process requirements, if "a person of ordinary intelligence" could not "reasonably understand" that it forbids the conduct for which he is criminally charged.

*Id.* (quoting *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed.2d 989 (1954)). We cannot find that the addition of subsection 1–A to section 201(1)(B),

the depraved indifference murder statute, affects its ability to meet this standard or causes it to fall so far short of it that a charge thereunder must be seen as depriving the defendant of a fair trial. The statute gives fair notice that it is intended to proscribe conduct resulting in death that a defendant knew or a reasonable and prudent person in his situation would have known would cause a very high degree of risk of death or serious bodily injury, and, when viewed in the totality of the circumstances, reflects a depraved indifference to the value of human life. Moreover, the definition of depraved indifference found in section 201(1–A) is in accordance with prior judicial decisions. That language already has withstood constitutional scrutiny. *See State v. Crocker,* 435 A.2d at 65, 67. In short, section 201(1)(B) is not rendered unconstitutionally vague by the enactment of subsection 1–A.

### B. *Arbitrariness*

The defendant's second challenge is that depraved indifference murder as now defined by section 201(1)(B), (1–A) is not rationally distinguishable from the crime of manslaughter, 17–A M.R.S.A. § 203 (1983), and that the statute imposing a more severe penalty for depraved indifference murder is thus necessarily arbitrary and therefore invalid. The defendant failed to raise this issue at the trial court level. Accordingly, even though it purports to be of constitutional dimension, we review it only for "obvious error affecting substantial rights." *See State v. Willoughby,* 507 A.2d 1060, 1069 (Me.1986); M.R.Crim.P. 52(b).

■ Prior to the enactment of section. 201(1–A), we expressly addressed and re-

dinary practice in assigning criminal responsibility in that [it] permit[s] a finding of guilt without any showing of a subjective state of mind on the part of the actor." *State v. Crocker,* 435 A.2d at 63 n. 3; *see also State v. Lagasse,* 410 A.2d at 540; *State v. Goodall,* 407 A.2d at 279–80.

**2.** Public Law 1985, ch. 416, repealed section 201(1–A) and enacted in its place:

For purposes of subsection 1, paragraph B, when the crime of depraved indifference murder is charged, the crime of criminally negligent manslaughter shall be deemed to be charged.

Accordingly, the term "depraved indifference to the value of human life" presently is no longer separately defined by statute.

jected the contention that depraved indifference murder cannot be rationally distinguished from the crime of manslaughter. In *State v. Crocker,* 435 A.2d at 63–67, we discussed the differences between the two crimes and concluded that although they differ only in degree, they are constitutionally distinguishable. *See also State v. White,* 460 A.2d 1017, 1019–20 (Me.1983). Section 201(1–A) in no way affects our previous conclusion.

The defendant's remaining challenges to the constitutionality of section 201(1)(B), (1–A) lack merit and require no discussion.

## II. *The Challenge to the Indictment*

The defendant next attacks the sufficiency of the indictment upon which he was convicted. Count II of the indictment charged:

> On or about the 10th day of December, 1983, in the County of Somerset, State of Maine, EDWARD B. MICHAUD, did engage in conduct which manifested a depraved indifference to the value of human life in that
>
> (a) a reasonable and prudent person in MICHAUD's situation would have known that there was a very high degree of risk that MICHAUD's conduct would cause serious bodily injury; and
> (b) MICHAUD's conduct, when viewed in light of the totality of the circumstances, reflected such an indifference to the value of human life that it would be generally regarded by a reasonable and prudent person as depraved, and, such conduct in fact caused the death of Garrett Brann, all in violation of 17–A M.R.S.A. § 201(1)(B) and (1–A) (1983 & Supp.1983).

An indictment is sufficient

> if it contains such plain, concise, and definite allegations of the essential facts constituting the offense as shall adequately apprise a defendant of reasonable and normal intelligence of the act charged, enabling him to defend himself, and, upon conviction or acquittal, to make use of the judgment as the

basis for a plea of former jeopardy, should the occasion arise.

*State v. Carter,* 444 A.2d 37, 39 (Me.1982); *see also State v. Weymouth,* 496 A.2d 1053, 1057 (Me.1985).

■ Applying this standard to Count II of the indictment, it is readily apparent that the indictment is sufficient. Count II notifies the defendant in plain terms that he is charged with the depraved indifference murder of Garrett Brann on or about December 10, 1983. Allegations of the victim's name, the date of the offense, and the provisions of the statute that the defendant was charged with violating, satisfied the standards for a valid indictment and were sufficient to sustain this conviction. *See State v. Spearin,* 477 A.2d 1147, 1157 (Me. 1984); *State v. Crocker,* 435 A.2d at 68; *see also* M.R.Crim.P. Form 4. Although subpart (a) of Count II of the indictment omits part of the statutory language contained in subpart A of section 201(1–A), the subpart contained in the statute is phrased in the alternative. Thus, the State can elect which part of the subpart it wishes to charge. If the defendant desired further specification of what conduct the State alleged "manifested a depraved indifference to human life," he was free to request a bill of particulars. *See* M.R.Crim.P. 16(c)(2); *see also State v. Crocker,* 435 A.2d at 68. Relying on *State v. Nappi,* 369 A.2d 230 (Me.1977), the defendant also contends that Count II unfairly allowed the State to conceal from him the facts and theories of its case. His reliance on *Nappi* is misplaced because the issue there involved an alleged variance between the allegations of the indictment and the proof adduced at trial. *Id.* at 231–32. Moreover, we considered and rejected the substance of the defendant's argument in *State v. Hickey,* 459 A.2d 573, 579–83 (Me.1983). Without question the presiding justice correctly refused to dismiss Count II of the indictment.

## III. *Exclusion of Statements by Expert Witness*

The defendant next contends that the court erred in excluding from evidence the

proposed testimony of a certain expert witness. The defendant presented two psychologists who testified to the defendant's mental condition at the time of the shooting. Before Dr. Frank A. Wood was presented as an expert witness for the defense, the State in an in limine motion sought to exclude his proposed testimony reiterating what was contained in seven of his written statements that were included in a letter to the defendant's counsel. The trial justice excluded the testimony that would have repeated what the witness had said in several of these statements because they stated factual conclusions that were within the jury's prerogative to decide. The relevant statements to which the defendant proposed to have Dr. Wood testify are as follows:

1. Mr. Michaud does indeed appear to have been under the influence of extreme anger at the time of the homicide. Mr. Michaud seemed to be having an understandable reaction to finding his long-term girlfriend with another man.

2. Mr. Michaud does indeed appear to have had considerable alcohol and drug intake immediately prior to the homicide. This would certainly have affected his judgment as to the risk to others from his actions.

5. From my interview with Mr. Michaud, it is my impression that he was operating under extreme anger and was not clearly aware himself of his actions but that he certainly did not intend to cause death.

7. I do not believe that Mr. Michaud's state of mind represented a "depraved indifference" to what his actions might cause. I feel certain if the victim had been visible to Mr. Michaud he would not have attempted to harm that person.

■ The trial justice by excluding this testimony acted well within his discretion. The nature and form of these statements do not meet the requirements of admissibility set forth in Rule 702 of the Maine Rules of Evidence. Under Rule 702, the justice must consider whether the matter testified

to is beyond the ability of the untrained juror to determine it intelligently and whether a person with specialized knowledge can give a helpful opinion. *See* Field & Murray, *Maine Evidence* § 702.1, at 171 (1976). The rule applies to both legal and factual conclusions. In *State v. Flick*, 425 A.2d at 171, we stated that a medical professional may not testify to legal conclusions.

> Under M.R.Evid. 701 and 702, the presiding justice may exclude opinions which state *legal* conclusions, beyond the specialized knowledge of the expert. He may also exclude opinions which are arguably within the expert's specialized knowledge, but which are so conclusory, or so framed in terms of the legal conclusions to be drawn, that they will not "assist the trier of fact" (M.R.Evid. 702), or will pose a danger of confusing the jury which outweighs their probative value (M.R.Evid. 403), or if there is an insufficient factual basis to support the conclusions (M.R.Evid. 705(b)).

*Id.* (emphasis in original); *see also State v. Murphy*, 496 A.2d 623, 630–32 (Me.1985).

Because the expert witness's disputed proposed testimony contained both factual conclusions that the jury had the capacity to draw without expert assistance and inadmissible legal conclusions, the trial justice properly excluded them. Accordingly, we find no merit to the defendant's contention.

IV. *The Sufficiency of the Evidence to Raise the Issue of Insanity*

The defendant next contends that the trial justice erred by not instructing the jury on the insanity defense. After both parties rested, the State moved to withdraw from the jury's consideration the issue whether the defendant suffered from a mental disease or defect at the time he committed the offense charged. The trial justice granted the motion over the defendant's objection. He found

> no basis ... where a jury could find by a preponderance of the evidence that the Defendant's conduct in this case was a result of mental disease or defect as op-

posed to simple anger or personality disorder that doesn't rise to the degree of mental disease and defect or the result of ingestion of alcohol or drugs as the last witness [Dr. Wood] indicated.

To determine whether the failure to instruct on the insanity defense was error, we must decide whether, viewing the evidence in a light most favorable to the defendant, no factfinder rationally could find by a preponderance of the evidence that "at the time of the criminal conduct, as a result of mental disease or defect, the defendant either lacked substantial capacity to conform his conduct to the requirements of the law or lacked substantial capacity to appreciate the wrongfulness of his conduct." 17–A M.R.S.A. § 39 (1983).[3]

The defendant presented two expert witnesses who testified regarding his mental condition in December, 1983. Dr. Charles W. Acker, a clinical psychologist, testified that he found no evidence that the defendant suffered from a mental illness. The other expert, Dr. Wood, opined that the defendant had a "paranoid personality disorder." This disorder caused the defendant to have loose or fragmented thinking when he was under stress and generally to have difficulty in interpersonal relationships because he was likely to be distrustful of others. According to Dr. Wood, as a result of this condition, at the time of the killing the defendant suffered a *"loosening* of control," was *"functioning* more ... on the psychotic end," and was *"approaching* a state of mental illness, people with a personality disorder under stress *begin to approach* a more serious mentally ill condition." (emphasis added). Dr. Wood based his conclusion that the defendant was approaching a mental illness at the time of the killing on the facts that the defendant was under stress, had been consuming alcohol and other drugs such as marijuana and Valium, and was angry.

■ Taken in a light most favorable to the defendant, Dr. Wood's testimony does not establish the existence of a mental disease or defect as defined in subsection 2 of section 39. *See supra* note 3. His testimony does not go beyond stating that the defendant was "approaching" a state of mental disease or defect, that he suffered a loosening, not a loss of control and that his condition of stress, consumption of alcohol and drugs made it more difficult for the defendant to exercise self-control. Although we recognize that the medical definition of mental disease or defect may not be identical to the legal definition, we conclude on this record that no factfinder by a preponderance of the evidence rationally could have found the defendant not guilty by reason of mental disease or defect. Accordingly, the trial justice did not err in removing from the jury's consideration the insanity issue.

## V. *Challenges to the Jury Instructions Pertaining to 'Knowing' Murder*

The defendant next contends that the trial justice committed reversible error by instructing the jury on "transferred intent" relative to Count I and by refusing to instruct the jury on aggravated assault, 17–A M.R.S.A. § 208 (1983), as a lesser included offense of knowing murder.

---

3. Section 39 provides in full:
   1. A defendant is not criminally responsible if, at the time of the criminal conduct, as a result of mental disease or defect, he either lacked substantial capacity to conform his conduct to the requirements of the law, or lacked substantial capacity to appreciate the wrongfulness of his conduct. The defendant shall have the burden of proving, by a preponderance of the evidence, that he lacks criminal responsibility as described in this subsection.

   2. As used in this section, "mental disease or defect" means any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs the processes and capacity of a person to control his actions. An abnormality manifested only by repeated criminal conduct or excessive use of alcohol, drugs or similar substances, in and of itself, does not constitute a mental disease or defect.

Prior to charging the jury, the trial justice determined, over the defendant's objection, that he would instruct the jury on transferred intent. During his jury instructions relative to Count I, the justice explained a "knowing" killing as follows:

Two, the State must prove beyond a reasonable doubt that the Defendant caused Garrett Brann's death knowingly. A person causes death knowingly if he is aware that it is practically certain that his conduct will cause death. That is, the State must prove that the Defendant knew that a person's death would almost certainly result from his conduct. If the Defendant is aware that it is practically certain that his conduct will cause death, and his conduct does in fact cause death, it makes no difference if the Defendant's conduct was not directed towards any particular person, or if the person actually killed was not the person towards whom the Defendant's conduct was directed. The Defendant may still be convicted of knowing murder if all of the elements are proven beyond a reasonable doubt.

■ Assuming without deciding that the trial justice erred in instructing the jury that it could find a knowing murder if it found that, at the time of his death-producing conduct, the defendant was aware that it was practically certain that his conduct would in fact cause the death of some person who was not necessarily the named victim, the error is harmless. The jury acquitted the defendant as to knowing murder on Count I; instead, it found the defendant guilty of manslaughter. The jury's rejection of the theory that the defendant had committed a knowing murder disarms the defendant of any claim that this instruction, if erroneous, resulted in actual prejudice to him. *See State v. MacDonald*, 409 A.2d 240, 241 (Me.1979).

Next, we reject the defendant's argument that the trial justice should have instructed the jury on aggravated assault. Title 17–A M.R.S.A. § 13–A(1) (1983) provides in part:

The court shall not instruct the jury to consider … a lesser included offense, as defined in subsection 2, unless on the basis of the evidence there is a rational basis for finding the defendant guilty of that lesser included offense. If a rational basis exists, the lesser included offense shall be considered by the factfinder if requested by either the State or defendant; otherwise, its consideration shall be a matter within the discretion of the court.

■ Aggravated assault, 17–A M.R.S.A. § 208, is a lesser included offense of knowing murder pursuant to 17–A M.R.S.A. § 13–A(2)(A) (1983). *See* 17–A M.R.S.A. § 34(3) (1983). The parties stipulated that the defendant caused the death of Garrett Brann by the firing of a shotgun. Since the result of the defendant's conduct was death, not bodily injury or serious bodily injury, no rational basis existed to instruct the jury on any form of aggravated assault.[4] The trial justice recognized this fact and properly denied the defendant's request.

## VI. The Propriety of the Jury Instruction on Adequate Provocation as it Relates to Depraved Indifference Murder

The defendant asserts that the trial justice erred in giving an instruction on "adequate provocation" manslaughter relative to Count II; that the instruction confused the jury; that the trial justice failed to eliminate the confusion in responding to

---

4. Section 208 provides in part:

1. A person is guilty of aggravated assault if he intentionally, knowingly, or recklessly causes:

A. Serious bodily injury to another; or

B. Bodily injury to another with use of a dangerous weapon; or

C. Bodily injury to another under circumstances manifesting extreme indifference to the value of human life. Such circumstances include, but are not limited to, the number, location or nature of the injuries, the manner or method inflicted, or the observable physical condition of the victim.

the jury's request for reinstruction; and that the court's denial of his request for a mistrial constituted an abuse of discretion. We find no merit to any of these contentions.

In his charge the trial justice provided the jury with separate instructions as to each count. He directed that the jury consider each count separately and distinctly, including separate consideration of any lesser included offenses, and that it return verdicts consistent with this method of deliberation. On Count II, the trial justice instructed the jury that in order to return a verdict of guilty, it had to find beyond a reasonable doubt, first, that the death-producing conduct of the defendant must be conduct which by its very nature creates a very high degree of risk that the conduct will result in serious bodily injury, second, that the conduct objectively must reflect depraved indifference to the value of human life, and

> [t]he third fact necessary for a conviction under the depraved indifference charge again is the State must prove beyond a reasonable doubt that at the time of the death, the Defendant either was not under the influence of extreme anger, or that if he were under such influence, it was not brought about by adequate provocation as I've already defined that term.

> .    .    .    .    .

> [I]f you conclude that the State has proven the first two facts beyond a reasonable doubt, but has failed to prove the third fact that the Defendant's acts caus-

ing death were not done while he was under the influence of extreme anger, or that if he was under such influence, it was brought about by adequate provocation, then you should find the Defendant guilty of manslaughter on Count Two.

■ The law in existence at the time the defendant committed the crime, P.L.1983, ch. 372 (codified at 17–A M.R.S.A. § 201(3), (4) and (5) (Supp.1985–1986)), provides that adequate provocation is an *affirmative defense under 201(1)(A).*[5] Adequate provocation is *not* an affirmative defense, and has no application, to depraved indifference murder, section 201(1)(B), (1–A). Apparently, the trial justice charged the jury under the prior law that treated "adequate provocation" as a palliating punishment category under 17–A M.R.S.A. § 203(1)(B), (2) (1983) *repealed by* P.L.1983, chs. 372 and 480, § B, 23. Section 203(1)(B), formerly provided:

1. A person is guilty of manslaughter if he:

.    .    .    .    .

B. Causes the death of another human being under circumstances which would otherwise be murder except that the actor causes the death while under the influence of extreme anger or extreme fear brought about by adequate provocation.

The instruction given by the trial justice was far more favorable to the defendant than that to which he was legally entitled. As a result, the defendant cannot be heard to complain of an error that worked to his advantage. *See State v. Flash,* 418 A.2d

**5.** Section 201(3), (4) & (5) provides:
**3.** It is an affirmative defense to a prosecution under subsection 1, paragraph A, that the actor causes the death while under the influence of extreme anger or extreme fear brought about by adequate provocation.
**4.** For purposes of subsection 3, provocation is adequate if:
**A.** It is not induced by the actor; and
**B.** It is reasonable for the actor to react to the provocation with extreme anger or extreme fear, provided that evidence demonstrating only that the actor has a tendency towards extreme anger or extreme fear shall

not be sufficient, in and of itself, to establish the reasonableness of his reaction.
**5.** Nothing contained in subsection 3 may constitute a defense to a prosecution for, or preclude conviction of, manslaughter or any other crime.
Title 17–A M.R.S.A. § 203(1)(B) (Supp.1985–1986) provides that a person is guilty of manslaughter if he "intentionally or knowingly causes the death of another human being under circumstances which do not constitute murder because he causes the death while under the influence of extreme anger or extreme fear brought about by adequate provocation."

158, 163 (Me.1980); *State v. Heald*, 292 A.2d 200, 201–202 (Me.1972).

■ The defendant next asserts that the substance of the adequate provocation instruction pertaining to depraved indifference murder was confusing and misleading. After a careful review of the jury instructions, we find no merit in the defendant's argument.

The defendant also contends that the trial justice committed reversible error in reinstructing the jury. Shortly after the jury retired, the court received a note from the jury asking for a copy of the instructions because it was "confused about all the elements." The court informed the jury that the instructions were "not in a form where it can be given to you in writing." The defendant had previously objected to the charge being written out for the jury's use. Eighty minutes later, the jury notified the court that it was confused about the elements of the crime. The trial justice recalled the jury and repeated his charge on the elements of the two alternative forms of murder and the lesser included offenses. The defendant objected claiming that he was prejudiced by the reinstruction on only certain portions of the original charge. The trial justice overruled the objection. Moreover, he declined to give the defendant's requested instructions because they did not accurately state the law.[6] The jury again retired for further deliberation. Ninety minutes later the jury by note informed the trial justice that "we have more questions on Count II, particularly mental responsibility." The justice offered to reread his previous instructions pertaining to Count II. The defendant objected and moved for a mistrial on the ground that the jury was confused. The justice denied the request and re-read his instructions on Count II. The jury again retired and fifteen minutes later, returned its verdict.

■ We reject the defendant's contention that the trial justice erred in reinstructing the jury. The decision of the trial

justice in such matters is subject to review only for abuse of discretion. *See State v. Turner*, 495 A.2d 1211, 1214–15 (Me.1985). Here, the trial justice limited his reinstructions to what the jury requested. Furthermore, he emphasized to the jury the need for it to consider all the other instructions as well. That he utilized the same explanatory language does not of itself render the reinstructions deficient. We conclude that the justice acted well within the bounds of his discretion.

■ We similarly discern no merit in the defendant's contention that the trial justice abused his discretion by refusing to grant a mistrial. The trial justice has broad discretion to determine whether to grant a motion for a mistrial. *See, e.g., State v. Henderson*, 435 A.2d 1106, 1108 (Me.1981). That discretion was not abused here. The jury had not indicated that it was hopelessly confused by the instructions as given. Instead, it sought reinstructions on several elements of the alternative forms of murder, which were provided. The trial justice acted within his discretion in his denial of the motion for a mistrial.

## VII. *The Sufficiency of the Evidence*

The defendant asserts that the evidence was insufficient to support his conviction for murder. Specifically, he contends that as a matter of law, his death-producing conduct can not be regarded as manifesting a depraved indifference to the value of human life. The standard to be applied in reviewing the sufficiency of the evidence is whether, based on that evidence viewed in the light most favorable to the State, any trier of fact rationally could find proof of guilt beyond a reasonable doubt. *State v. Barry*, 495 A.2d 825, 826 (Me.1985). Our review of the record reveals sufficient evidence from which the jury could have concluded beyond a reasonable doubt that the defendant, by conduct manifesting a depraved indifference to the value of human life, caused the death of Garrett Brann.

6. On appeal, the defendant does not contend    otherwise.

When the defendant returned to the Hunt home and fired two shots from a twelve-gauge shotgun into the building from a distance of fifty feet, one of which killed Garrett Brann, he was aware that the two adults and five children were inside. The jury could have found that a reasonable and prudent person in the defendant's position would have known that there existed a very high degree of risk that such conduct would result in death or serious bodily injury to one of the persons known to be inside the home. Further, the jury could have concluded that it was, in all the circumstances, unjustifiable for the defendant to take that risk. Accordingly, we find the evidence sufficient to sustain the defendant's murder conviction under section 201(1)(B), (1–A).

## VIII. *Other Issues*

Our careful review of the record persuades us that other issues raised by the defendant are without merit and require no discussion.

The entry is:

Judgment affirmed.

All concurring.